IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MKRTICH M. YEPREMIAN

    Petitioner

V.                                      Case No.:   15-CR-346S

UNITED STATES OF AMERICA

    Respondent

MEMORANDUM OF LAW IN SUPPORT OF
PETITIONER'S 28 U.S.C. § 2255 PETITION

Petitioner Mkrtich M. Yepremian hereby files his memorandum in support of his 28 U.S.C. § 2255 Motion.

Respectfully Submitted,

Mkrtich M. Yepremian
Petitioner

## TABLE OF CONTENTS

| DESCRIPTION | PAGE |
|---|---|
| TABLE OF AUTHORITIES | ii |
| MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S § 2255 | |
| I.   JURISDICTION | 1 |
| II.  JUDICIAL REQUEST | 1 |
| III. STANDARD OF REVIEW | 2 |
|      A.  EFFECTIVE ASSISTANCE OF COUNSEL | 3 |
|      B.  TO PROVE INEFFECTIVE ASSISTANCE OF COUNSEL | 3 |
|      C.  PERFORMANCE PRONG | 3 |
|      D.  PREJUDICE PRONG | 4 |
| IV.  INTRODUCTION - HISTORY | 4 |
|      A.  MEDICAL BUSINESSES | 4 |
|      B.  GOVERNMENT INVESTIGATION | 7 |
| V.   ARGUMENT | 10 |
|      GROUND NUMBER I - IMPROPER LOSS CALCULATION | 10 |
|      A.  OUTRAGEOUS GOVERNMENT CONDUCT | 10 |
|      B.  DUE PROCESS | 11 |
|      C.  SENTENCING FACTOR MANIPULATION | 13 |
|      D.  SUMMARY OF GROUND I | 15 |
|      GROUND NUMBER II - IMPROPER RESTITUTION ORDER | 17 |
|      A.  THE GOVERNMENT WAS NOT A VICTIM | 17 |
|      B.  SUMMARY OF GROUND II | 19 |
| VI.  CONCLUSION | 20 |
| VII. DOCUMENT REFERENCE PAGE | 21 |
| VIII EXHIBIT REFERENCE PAGE | 22 |

## TABLE OF AUTHORITIES

DESCRIPTION                                                          PAGE

FEDERAL CASE LAW

   Haines v. Kerner

      404 U.S. 519, 520 (1972)                                   1

   Erickson v. Pardus

      551 U.S. 89, 94 (2007)                                     1

   Martinez v. Ryan

      U.S. No. 10-1001, 3/20/12                                  2

   Halbert v. Michigan

      545 U.S. 605 - 619 (2005)                                  2

   Nix v. Whiteside

      475 U.S. 157, 175 (1986)                                   3

   United States v. Cronic

      466 U.S. 648, 654 (1984)                                   3

   Strickland v. Washington

      406 U.S. 688, 690, 692 (1984)                              3
      406 U.S. 686, 690, 693, 694 (1984)                         4

   Williams v. Taylor

      529 U.S. 362 (2000)                                        3

   Bell v. Cone

      533 U.S. 685 (2002)                                        4

   CF. Woodford v. Visciotti

      537 U.S. 19 (2002)                                         4

## TABLE OF AUTHORITIES

**DESCRIPTION**                                                          **PAGE**

FEDERAL CASE LAW

United States v. Sanchez (Eleventh Circuit)

    138 F.3d 1413                                                        10

    138 F.3d 1413                                                        11

    138 F.3d 1410, 1413                                                  13

    138 F.3d 1410, 1414                                                  14

United States v. Haimowitz (Eleventh Circuit)

    725 F.2d 1561, 1577                                                  11

United States v. Sanchez-Berrios (First Circuit)

    424 F.3d 65, 78, 79                                                  11

United States v. Barbour (First Circuit)

    393 F.3d 82, 86                                                      11

Mistretta v. United States

    488 U.S. 361, 109 S. Ct. 647 (1989)                                 12

United States v. Ngo (Fifth Circuit)

    LEXIS 76181                                                          12

    LEXIS 76181                                                          14

United States v. Richardson (Fifth Circuit)

    925 F.2d 112                                                         12

    925 F.2d 112, 117 - 118                                              13

United States v. Connell (First Circuit)

    960 F.2d 191, 194                                                    13

    960 F.2d 191, 196                                                    15

United States v. Tremeling (Fifth Circuit)

    43 F.3d 148, 151                                                     13

## TABLE OF AUTHORITIES

**DESCRIPTION**                                                                  **PAGE**

FEDERAL CASE LAW

    United States v. Snow (Fifth Circuit)

       309 F.3d 294, 295                                                   14

    United States v. Ciszkowski (Eleventh Circuit)

       492 F.3d 1266, 1270                                                 16

    United States v. Gibbens (First Circuit)

       25 F.3d 25, 32                                                      17
       25 F.3d 33                                                          18
       25 F.3d 34, 35                                                      19

    Ratlift v. United States (Sixth Circuit)

       999 F.2d 1023, 1027                                                 17

    Gall v. United States (Sixth Circuit)

       21 F.3d 107 [U.S. app. LEXIS 6869, at * 14]                         17

    United States v. Daddato (Seventh Circuit)

       996 F.2d 903, 905                                                   18

    United States v. Salcedo-Lopez (Ninth Circuit)

       907 F.2d 97, 98                                                     18

U.S. CODE

    Title 28 U.S.C. § 2255                                                  1
    Title 28 U.S.C. § 2255                                                  2

    Title 18 U.S.C. §§ 3663-3664                                           17
    Title 18 U.S.C. §§ 3663-3664 (VWPA)                                    18
    Title 18 U.S.C. §§ 3663-3664 (VWPA)                                    19

## TABLE OF AUTHORITIES

**DESCRIPTION**                                              **PAGE**

  U.S.S.G. (SENTENCING GUIDELINES)

    U.S.S.G. § 2B1.1(b)(1)(K)                          16

    U.S.S.G. § 2B1.1(b)(7)(ii)                         16

    U.S.S.G. § 2B1.1(b)(1)(J & K)                      20

    U.S.S.G. § 2B1.1(b)(7)(i & ii)                     20

  UNITED STATES CONSTITUTION

    Sixth Amendment                                    3

    Fifth Amendment                                    13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MKRTICH M. YEPREMIAN

    Petitioner

V.                              Case No.:   15-CR-346S

UNITED STATES OF AMERICA

    Respondant

MEMORANDUM OF LAW IN SUPPORT OF
PETITIONER'S 28 U.S.C. § 2255 PETITION

COMES NOW, Mkrtich M. Yepremian (hereinafter defendant, petitioner, or "Mkrtich") appearing Pro'Se and respectfully moves this Honorable Court seeking to have his conviction and/or sentence vacated, set aside or corrected in the above cited criminal matter, pursuant to 28 U.S.C. § 2255.

## I:  JURISDICTION

This Honorable Court, being the Original Court of conviction and sentencing, jurisdiction is conferred in the language of 28 U.S.C. § 2255.

## II:  JUDICIAL REQUEST

Due to the Pro'Se nature of this filing, Mkrtich respectfully requests that this Honorable Court provide a less stringent standard of review when examining petitioner's attempts at case citing, rules, procedures, and legal syntax.  See; Haines V. Kerner, 404 U. S. 519, 520 (1972); and Erickson V. Pardus, 551 U.S. 89, 94 (2007).

For purposes of the Honorable Court's consideration, Mkrtich

1

would respectfully further elaborate upon the principles reflected
by the Supreme Court in its recent decision in Martinez v. Ryan,
(U.S. No. 10-1001, 3/20/12) with regards to Martich's attempts to
raise accurate, coherent, and precise claims in his initial § 2255
filing.  In Martinez, the Supreme Court observed that "[d]efendants
pursuing their first-tier...review are generally ill-equiped to re-
present themselves" (quoting Halbert v. Michigan, 545 U.S. 605-617
(2005)).  The Court went on to note that, "[w]ithout the help of an
attorney, a prisoner will have difficulties vindicating a substan-
tial claim of ineffective assistance of counsel [in a collateral
proceeding]."  See; Halbert v. Michigan, Id. at 619.  Furthermore,
the Court stated that, "[P]risoners, unlearned in the law, may not
comply with the procedural rules or may misapprehend the substan-
tial details of federal constitutional law," and "while confined in
prison, the prisoner is in no position to develop the evidentiary
basis for a claim of ineffective assistance of counsel; which of-
ten turns on evidence outside the trial record." Id.  The Court
continued its observation noting that, "[a] prisoner's inability
to present a claim of error is of particular concern when the claim
is on of ineffective assistance of counsel" because "[t]he right to
effective counsel is a bedrock principle in this nation's justice
system."  Id.

### III:  STANDARD OF REVIEW

Title 28 U.S.C. § 2255, is the primary means under which a
federal prisoner may collaterally attack the legality of his con-
viction or sentence.  Therefore, Mkrtich presents his issues, claims

2

and grounds in this forum.

## A.   EFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment provides that "[in] all criminal procedures the accused shall enjoy the right to have assistance of counsel for his defense." See; U.S. Constitution, Amendment 6.  A defendant has the right not just to counsel, but to "reasonable effective assistance of counsel."  See; Nix v. Whiteside, 475 U.S. 157, 175 (1986); and United States v. Cronic, 446 U.S. 648, 654 (1984).

## B.   TO PROVE AN INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

For a violation of the Sixth Amendment, a defendant must satisfy the two prong test analysis established in Strickland v. Washington, 466 U.S. 688 (1984).  Under Strickland, the defendant must show that; (1) Counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant.  See; Strickland (Id.) at 692.

## C.   PERFORMANCE PRONG

To satisfy the first prong of the Strickland analysis, the petitioner must show that counsel's performance was deficient.  "[A] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or ommissions of counsel that are alleged not to have been the result of reasonable professional judgment".  See; Strickland, Supra at 690 (Id.).  Also see; CF. Williams v. Taylor, 529 U.S. 362 (2000).  Deficient performance is one that falls "outside the wide range of professionally competent assistance."  See; Strickland, Supra at 690 (Id.).  Lastly, to establish deficient performance, the petitioner must show that coun-

3

sel's representation fell below an objective standard of reason-
ableness." See; Strickland, Supra, at 690 (Id.).

D.  PREJUDICE PRONG

The second component of the Strickland test requires the peti-
tioner to demonstrate that he [the defendant] was prejudiced as a
result of counsel's deficient performance.  See; Strickland, Supra,
at 690 (Id.).  To prove prejudice, the petitioner must show "that
there is a reasonable probability that, but for counsel's unprofes-
sional errors, the results of the proceeding would have been dif-
ferent." See; Strickland, Supra, at 694 (Id.); see also; Bell v.
Cone, 533 U.S. 685 (2002).  A "reasonable probability" is one that
is sufficient to undermine the outcome." See; Strickland, Supra,
at 693 (Id.); CF. Woodford v. Visciotti, 537 U.S. 19 (2002).  Thus,
a petitioner need not show counsel's deficient performance, more
likely than not, altered the outcome in this case; rather, he must
show only a [probability] sufficient to undermine confidence in the
outcome.  Finally, "[t]he benchmark for judging any claim of inef-
fectiveness must be whether counsel's conduct so undermined the
proper functioning of the adversarial process that the trial can-
not be relied on as having produced a just result."  Strickland
at 686 (Id.).

IV.  INTRODUCTION - HISTORY

A.  MEDICAL BUSINESSES

In late 2007 Mkrtich opened Empire Clinical Laboratory (Em-
pire) in Houston, Texas a facility designed to analyze blood and
urine samples.  The laboratory accepted samples from doctors whose

4

patients paid cash or were insured through private insurance or
Medicare/Medicaid (Medicare).  The laboratory staff was comprised
of a doctor, who was the medical director of the lab; phlebotomists
who drew blood samples from walk-in patients; lab technicians; lab
assistants; and various office support personnel.  Although incorp-
orated in 2007, the laboratory had no approved Medicare payments
until 2008.  In 2008 the Medicare billings were relatively moderate
totalling only $404,000, but by 2009 the laboratory billings had
ramped up to $1.5 million.  Beginning in 2010 the amount of Medi-
care billings from Empire were dramatically reduced reflecting the
transfer of clinic related services to the clinics operated by
Mkrtich.  From 2008 through 2015, when Mkrtich was arrested and
the laboratory was closed, the total amount alleged by the govern-
ment to have been fraudulently billed by Empire to Medicare was
$6.228 million, and the amount of alleged fraudulent payments from
Medicare totalled $5.086 million.  See; Exhibit I.

     Although the government claimed Empire was part of a grand
conspiracy to embezzle funds from Medicare, and included all of its
billings as part of the alleged Medicare loss, no individuals from
the Empire staff were ever arrested or charged with misconduct.

     In 2010 Mkrtich opened Mid-City Healthcare (Mid-City), a clinic
designed to evaluate patients and determine whether follow up test-
ing or treatment should be performed based upon the patient's medi-
cal complaints, vital signs and general well being.  The staff was
comprised of a doctor, who was also the medical director; Phlebo-
tomists; Ultra-Sound Technicians; Physician Assistants; Pulmonary

Specialists and office support personnel. Medical procedures, testing and treatments performed by Mid-City staff included Ultra-Sound analysis, EKG Evaluations, Pulmonary Assessments, requests for lab work and any other type of medical action deemed necessary by the medical staff. Throughout 2010, Mid-City generated $1.430 million dollars of billings to Medicare but, due to billing dis-putes and errors in paperwork, received payments of only $681,000 forcing the closure of the clinic.

As was the case with Empire, Mid-City was also included in the same conspiracy fraud to embezzle Medicare funds although once again, no individuals from Mid-City were ever implicated in any fraudulent activity.

In 2011 Mkrtich opened a second clinic, Crawford Medical Ser-vices (Crawford) which replaced the Mid-City operation that had been closed, as noted above. In an effort to correct and avoid future Medicare billing disputes, Mkrtich recruited a completely new staff of doctors, technicians, medical assistants and office support per-sonnell. Although opened in 2011, only insignificant Medicare bil-lings were processed in the first year of business with only moder-ate billings totalling $395,000 in 2012. In 2013 and 2014 Crawford's billings totalled $1.416 and $1.314 respectively.

In an effort to expand his business, Mkrtich opened Arca Medi-cal Clinic (Arca) in 2012 in Conroe, Texas a small rural community approximately forty-five miles north of Houston. At the openning of this new clinic, Mkrtich transferred several personnel from the Crawford clinic who were familiar with a clinic's operations and

billing procedures.   These employees were Dr. Ross, a full time
physician at Crawford, and Ann Rocha, Office Manager.   Additional
Medical Technicians, a Physician's Assistant, Medical Assistants
and office personnel were hired to support the two individuals
who had been transferred from Crawford.   The Conroe location,
where Arca was located, had a small population base and only mini-
mal medical billings to Medicare (totalling $28,000) were processed
in 2012, with moderate billings of $233,000 and $373,000 in 2013
and 2014 respectively.   In 2015 Arca was closed after processing
billings of only $155,000.

Finally, in late 2014 Mkrtich opened a fourth clinic, Care
Family Practice (Care) which operated for only a short period of
time before being closed by the government's Sting operation in
2015.   This clinic was also located in Houston, Texas and generated
billings to Medicare totalling $940,000 in 2015.

B.   GOVERNMENT INVESTIGATION - STING OPERATION

In January 2012 the government began a 'Sting Operation'
(Sting) involving Mkrtich and all of his medical facilities using
a Confidential Informant (CI), Robert Brodsky, who approached Mkr-
tich to discuss a variety of business transactions, medical proce-
dures and Medicare billing options, to include the illegal use of
Marketers.   Ultimately, Mkrtich agreed to use the marketers who
had been introduced by the CI who provided Mkrtich with individuals
(patients) who were eligible for Medicare services through the il-
legal payment of kick-backs.   Several months later, another govern-

ment CI, whose name was 'Bridget', also approached Mkrtich to discuss the use of Marketers and the illegal kick-back scheme first introduced by Robert Brodsky.

All of the conversations initiated by the two CI's were recorded using Audio and Video equipment, a tactic that continued for the following three and one-half years until Mkrtich was arrested in July 2015.

The impact of the government Sting operation on the defendant's medical businesses is very apparent. An examination of the Medicare billings, and related payments, associated with the various medical business enterprises operated by Mkrtich reflect a dramatic increase in activity and dollar amount beginning in 2012 after the introduction of the illegal kick-back scheme. See; Exhibit I for dollar amount details. Reported below is a summary of the dollar and percentage increases that can be attributable to the kick-back scheme. Using 2011 (the year prior to the Sting) as the base, a comparative analysis of Medicare billings is presented for years 2012, when the government initiated its Sting, through the year 2015 when Mkrtich was arrested and his businesses closed.

| YEAR | BILLING DOLLAR INCREASE | PERCENTAGE INCREASE |
|------|-------------------------|---------------------|
| 2012 | $ 612,000 | 296 |
| 2013 | $2,359,000 | 854 |
| 2014 | $2,611,000 | 934 |
| 2015 | $1,346,000 ** | 530 ** |
| Total | $6,928,000 | |

** Represents only 1/2 half year of billing activity; Annualized Billings: $2,692,000 and Percent increase: 1,030

8

As is clearly evident by the facts through the data provided in the summary above, beginning in 2012, and escalating thereafter, the dollar and the percentage increases in Medicare billing from Mkrtich's medical operations, on both a micro and a macro level, were dramatic and in direct relationship to the use of the government's marketers.  As already noted, the increases for each year were continuing to escalate under the supervision of the government.  Even 2015, when annualized reflects an increase over the preceeding year(s).  Year after year, these increases in the illegal billing activity directly contributed to the increases in the defendant's Guideline Enhancement Levels which are the main determing factor of a defendant's period of incarceration.  It is a disturbing observation that the bulk of the fraudulent billing increases were fundamentally created, managed and monitored by the very government which later, after a span of 3.5 years, then arrested, charged and sentenced the defendant using the amounts of loss it had carefully seeded and then harvested years later.  This kind of manipulation is wrong.

Another observation reveals the government included virtually [All] of the billings and payments generated by the defendant's medical businesses in their loss and restitution calculations irrespective of whether they had been a part of a fraudulent transaction or involved in the government's kick-back scheme.  For the government to assume every individual transaction processed and then billed to Medicare over an eight period was fraudulent is an example of guilt by association which is also inappropriate.

9

## V.   ARGUMENT

GROUND I.   IMPROPER LOSS CALCULATION

A.   OUTRAGEOUS GOVERNMENT CONDUCT

The government's use of Confidential Informants (CI) in a
Sting operation (Sting) has been a long standing and recognized
useful method of law enforcement investigation which has been em-
braced by the federal judicial system and is an accepted fact the
defendant is [Not] here to argue.  What the defendant does find
objectionable is the length of time the government allowed the
illegal Medicare Kick-back billing scheme to proceed while under
the supervision, oversight and encouragement of the active CI who
continued to provide the defendant with direction and access to the
Marketers throughout the final 3.5 years of his business operations
which dramatically increased the level of his crime and level of
his penalty.  The defendant asserts this kind of malefic duplicity
used by the government is a recognizable form of outrageous govern-
mental conduct which, when it is unchecked by the courts and allowed
to contribute to a higher level sentence, becomes prejudicial, un-
constitutional and therefore an unacceptable way to penalize the
defendant.

"This Court recognizes the defense of outrageous governmental
conduct" which "focuses on the tactics employed by law enforcement
officials to obtain a conviction for conduct beyond the defendant's
predisposition."  See; United States v. Sanchez, 138 F.3d at 1413
(11th Circuit 1998).  "Whether outrageous governmental conduct
exists "turns upon the totality of the circumstances with no single

factor controlling""; Sanchez, 138 (Id.) at 1413, referencing
United States v. Haimowitz, 725 F.2d 1561, 1577 (Eleventh Cir-
cuit 1984).  "Such manipulation occurs only when the authorities
"venture outside the scope of legitimate investigation and engage
in extraordinary misconduct that improperly enlarges the scope
of scale of the crime.""  See; United States v. Sanchez-Berrios,
424 F.3d 65, 78, 79 (First Circuit 2005), referencing United
States v. Barbour, 393 F.3d 82, 86 (First Circuit 2004).

In the case before this Honorable Court today, the govern-
ment did 'venture outside the scope of legitimate investigation'
and it did 'enlarge the scope and scale of the crime' when it
improperly allowed its undercover Sting investigation to conti-
nue over an extended 3.5 year period.  During that time the
government encouraged and allowed an additional $8.2 million
dollars of Medicare billing to be processed, of which $6.9 mil-
lion was directly attributable to the illegal kick-back scheme
which it had initiated.  This purposeful decision maliciously
increased not only the amount of loss he was responsible for, but
it also increased his level of enhanced offense.

B.  DUE PROCESS

The defendant argues that the government has denied him due
process through the violation of the separation of powers doc-
trine by impermissibly manipulating the length of time necessary
to conduct and complete an investigation which included the use
of a CI in a Sting operation which occurred over an extended
period of 3.5 yeaars.  This unnecessarily expanded period of

11

government sponsored illegal Medicare billing allowed the prosecu-
tion to improperly increase the amount of loss incurred for the
purpose of creating greater sentencing exposure.

The power of the Executive branch to determine a defendant's
sentence based on the amount of billings sent to Medicare under an
illegal kick-back scheme during a government sponsored Sting opera-
tion violates the separation of powers doctrine.  This court agrees
that "if the Executive branch had the unilateral power to directly
and automatically ratchet up a sentence through these means, one
might then argue that such power could constitute the sort of
threat to the 'authority of independence' of the judicial branch
that the Supreme Court referred to as constitutionally infirm in
Mistretta v. United States, 488 U.S. 361, 109 S. Ct. 647, 102 L.
Ed. 2d 714 (1989)."  See; United States v. Ngo, U.S. Dist  LEXIS
76181 (Fifth Circuit 2013) under 'Analysis'; referencing United
States v. Richardson, 925 F.2d 112 (Fifth Circuit 1991).

Although the District Court retains the authority to find
that the amount of billing transactions processed throughout the
extended Sting operation was not permissible due to the length of
the investigation, and therefore not relevant conduct, the matter
was never addressed by the defendant's counsel, nor ever addressed
by this court at sentencing.  See; Sentencing Transcript, MKRTICH
M. YEPREMIAN, dated 26 April 2018, Case 4:15-CR-346-1, Document
Number One, pages 1 to 11 (Transcript pages 13 to 23).  "The Dis-
trict court judge is [Not] required to automatically enhance a
defendant's sentence simply because the government agents choose

to bring a certain amount of money to the table. The judge [must] make factual findings that the money brought to the table is "relevant" to the crime." See; United States v. Richardson, 925 F.2d, 112, 117. The failure of the defense attorney to recognize and challenge the government's improper inclusion of Medicare billings into the loss calculation that were not relevant to the crime under the due process clause of the Fifth Amendment to the United States Constitution is an example of Ineffective Counsel which has prejudiced the defendant.

## C. SENTENCING FACTOR MANIPULATION

"By definition, there is an element of manipulation in any sting operation." See; United States v. Connell, 960 F.2d 191, 194 (First Circuit 1992). While the defendant concedes that the Fifth Circuit has not formally recognized 'Sentencing Factor Manipulation' (SFM) as cognizable habeas corpus claim it has nonetheless inner twined the term with "Outrageous Government Conduct" and "Due Process", two defenses this circuit has recognized. Examples of this circuit's conjoined references of Sentencing Factor Manipulation with both Outrageous Government Conduct and Due Process are multiple and include the following.

> "This court recognizes the defense of outrageous governmental conduct, a defense interrelated with Sentencing Factor Manipulation theory." See; United States v. Sanchez, 138 F3.d, 1410, 1413 (11th Circuit 1998).

> "Although this Court apparently has not expressly determined whether we have accepted the concept of "Sentencing Factor Manipulation", we have addressed a similar contention in the context of a due process claim in United States v. Richardson, 925 F.2d, 112, 117 - 118 (Fifth Circuit 1991)"; See; United States v. Tremeling, 43 F.3d 148, 151 (Fifth 1995).

13

Thus, while this Honorable Court hitherto now has not been presented a case whose circumstances have conclusively defined an example of Sentencing Factor Manipulation, that is not to say the Court would, given the opportunity, rule against it. The defendant believes the facts and evidence associated with this case, as presented herein, provides this Honorable Court with such a determination.

Sentencing factor manipulation occurs when "a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." See; United States v. Ngo, U. S. District, LEXIS 76181 (Fifth Circuit 2013) under 'Analysis'; referencing United States v. Snow, 309 F.3d 294, 295 (Fifth Circuit 2002).

"Sentencing factor manipulation focuses on the government's conduct. It requires the court to consider whether the manipulation inherent in a sting operation, even if insufficiently oppressive to support an entrapment defense, or due process claim, must sometimes be filtered out of the sentencing calculus. Such a claim points to the opportunities that the sentencing guidelines pose for prosecutors to gerrymander the district court's sentencing options and thus, defendant's sentences." See; United States v. Sanchez 138 F.3d, 1410, 1414, (Eleventh Circuit 1998).

"It cannot be gainsaid that the sentencing guidelines, by their very nature, may afford the opportunity for sentencing factor manipulation, particularly in sting operations. We can for see situations in which exploitative manipulation of sentencing

14

factors by government agents might overbear...a person predispo-
sed only to committing a lesser crime.  This danger seems especial-
ly great in cases where the accused's sentence depends in large
part on the quantity of durgs or [money] involved."  See; United
States v. Connell, 960 F.2d 191, 196, (First Circuit 1992).

D.  SUMMARY OF GROUND I

The defendant has carefully developed different scenarios for
the court to review and determine which is the most appropriate
based on the facts and evidence provided.  It is the defendant's
belief that he was prejudiced by the government's improper calcu-
lation of a loss amount which was based upon the outrageous conduct
of the government's agents who allowed and encouraged a sting oper-
ation to continue far beyond the time necessary for a conviction.
The only possible result to be achieved by the needless continua-
tion of the government's investigation over a 3.5 year period was
the manipulated creation of a greater loss, and with that a greater
guideline enhancement.

"Outrageous government conduct occurs when law enforcement
obtains a conviction for conduct beyond the defendant's predis-
position by employing methods that fail to comport with due process
guarantees.  Under this standard, the conduct must be so outrageous
that is fundamentally unfair.  Similarly, Sentencing Factor Manipu-
lation occurs when the government's manipulation of a sting opera-
tion, even if insufficient to support a due process claim, requires
that the manipulation be filtered out of the sentencing calculus.
Outrageous government conduct would necessitate the reversal of a

15

defendant's conviction, while sentencing factor manipulation would simply reduce the sentence applied to his conduct." See; United States v. Ciszkowski, 492 F.3d, 1266, 1270 (11th Circuit 2007).

Whether the outrageous government conduct denied the defendant his due process under the safeguard of the Fifth Amendment (Id.), and therefore produced an unlawful conviction, or if insufficiently oppressive or broad enough to challenge the conviction nevertheless has allowed an illegal sentence, is for the court to determine. In either context, the defendant has been prejudiced by the inappropriate act(s) of the government which was allowed by the ineffective counsel Mkrtich received from his defense attorneys. At the very least, the defendant has suffered a loss of his freedom through the improperly increased guideline enhancements which were used by this court as a baseline for his sentencing. In the determination of the dollar amount of loss, there should have been a point in the investigation when the continued expansion of the illegal billing process, under the guidance of the government's agents, be removed from the guideline enhancement equation. Whether a limitation is drawn based upon the amount of the percentage of increases attributable to the Sting, or upon a particular point in time, the result is the same. When either practicable method is applied the loss calculation drops significantly below the elevated enhancement levels (under USSG §§ 2B1.1(b)(1)(k); and 2B1.1(b)(7)(B)ii) that were used by the prosecution, and accepted by the court, as the basis for sentencing the defendant.

16

GROUND II.   IMPROPER RESTITUTION ORDER

A.   THE GOVERNMENT WAS NOT A VICTIM

After being the subject of an undercover Medicare Sting in-
vestigation, which lasted 3.5 years, the defendant pled guilty
and was ordered to pay $9.1 million of restitution.  Included in
the balance of the $9.1 million was $6.025 million dollars that
was paid by the government to the defendant's medical businesses
during the undercover Sting.  The defendant argues that the Uni-
ted States was not a victim within the restitutionary provisions
of the Victim and Witness Protection Act (VWPA), Title 18 U.S.C.
S. §§ 3663-3664, and therefore [Not] entitled to a recovery of
these funds.

"It is settled doctrine that a government entity [such as
Medicare] "may be a victim" for purposes of the VWPA (and may be
awarded restitution) when it has passively suffered harm resul-
ting directly from the defendant's criminal conduct, as from
fraud or embezzlement."  See; United States v. Gibbens, 25 F.3d
25, 32 (First Circuit  1994); referencing Ratlift v. United
States, 999 F.2d, 1023, 1027 (Sixth Circuit 1993).

On the other hand, the federal courts are consentient to the
effect that "the government is [Not] a 'victim' for purposes of
VWPA (and may Not be awarded restitution) to the extent that it
incurs costs in the clandestine provocation of a crime."  See;
Gibbens (Id.) at 32, 33; referencing Gall v. United States, 21
F.3d 107 (Sixth Circuit 1994) [1994 U.S. app. LEXIS 6869, at *
14] (holding that "drug buy" money advanced by the government is

17

[Not] recoverable under VWPA); United States v. Daddato, 996 F.2d
903, 905 (Seventh Circuit 1993)(Similar)(Dictum); United States v.
Salcedo-Lopez, 907 F.2d 97, 98 (Ninth Circuit 1990)(holding that
money used by undercover government agent to purchase false iden-
tification documents is not recoverable under the VWPA).  All four
(4) of these cases rely at some level on the general assertion
that investigatory costs so not constitute a 'loss' within the
purview of the Act because such costs are best conceived as "vo-
luntary outlays for the procurement of evidence."  See; Gibbens
(Id.) at 33; referencing Daddato (Id.) at 905; and Salcedo-Lopez
(Id.) at 98.

When there is a crime "provoked by an undercover investigation
the crime was designed to inflict harm on the government.  If con-
summated under circumstances not involving official participation,
the crime would have resulted in direct loss to the government in
exactly the manner that the government here experienced loss.
Nonetheless, the government instigated the particular incidents
for which it now claims the right to restitution."  See; Gibbens
(Id) at 33.  As the defendant has noted in the other case law,
the loss experienced by the government in his case was "both a
calculated consequence of the defendant's crime and a calculated
cost of the government's investigation."  Not withstanding the
fact the government experienced a loss, it defies the application
of accepted law to determine an "entity that planned and helped
provoke a crime as a victim in the same sense that a passive suf-
ferer of harm is a victim, notwithstanding that the entity may

18

have experienced loss.  See; Gibbens (Id.) at 34.

"To sum up, nothing in the legislative history of either the organic Act or its amendments indicates that losses incurred in government sting operations should be subject to recoupment under the VWPA." See; Gibbens (Id.) at 35.  "A government agency that has lost money as a consequence of a crime that it has actively provoked in the course of carrying out an investigation may [NOT] recoup that money through a restitution order imposed under the VWPA."  Gibbens (Id.) at 35.

Although the District Court retains the authority to find, through the reasonableness of the evidence, an amount of restitution to be ordered against the defendant based upon the level of Medicare payments made, no challenge was ever made by the defense counsel to limit the government's claim based on case law that was readily available and is referenced herein.  See, Sentencing Transcript, MKRTICH M. YEPREMIAN, dated 26 April 2018, Case 4:15-CR-346-1, Document Number One, pages 1 to 11 (Transcript pages 13 to 23).  The failure of the defendant's counsel to object to a court order that clearly exceeded the limitation imposed by case law is another example of 'Ineffective Assistance of Counsel' which has harmed and prejudiced the defendant and is therefore unconstitutional.

B.   SUMMARY OF GROUND II

In the determination of the dollar amount of the restitution, the Court should have limited its order to an amount which excluded all payments made during the government's investigation.

## VI.   CONCLUSION

Based upon the arguments presented herein, and for all the foregoing reasons, the Defendant respectfully requests that this Honorable Court reverse his conviction, or minimally, reverse and resentence him based on a reduced loss amount that would exclude those billings that were unjustly incurred during the government's unnecessarily prolonged investigation.   The Defendant believes, and therefore asserts, but for his defense attorney's Ineffective Assistance of Counsel, the calculation of his Guideline Offense Level, which was the basis for his sentencing, would have been reduced by a cumulative total of at least three (3) points under the following U.S. Sentencing Guidelines:

* U.S.S.G. § 2B1.1(b)(1)(K) [Loss Enhancement]
  From level (K) to level (J); a two (2) point reduction

* U.S.S.G. § 2B1.1(b)(7)(B)ii [Medicare Loss Enhancement]
  From level ii to level i; a one (1) point reduction

Based upon the arguments presented herein, and for all the foregoing reasons, the Defendant respectfully requests that this Honorable Court amend the level of his restitution order that would exclude all payments made during the government's prolonged investigation.   The Defendant believes, and therefore asserts, but for his defense attorney's Ineffective Assistance of Counsel, the amount of restitution ordered would have excluded those payments made during the government's investigation which exceeded $6 million dollars.

20

## VII.   DOCUMENT REFERENCE PAGE

| DOCUMENT<br>PAGE NO. | DESCRIPTION | NUMBER<br>OF PAGES |
|---|---|---|
| One | Sentencing Transcript<br>Cover Sheet + Pages 13 to 23 per<br>the transcript; pages 1 to 11 per<br>the Memorandum/Legal Brief | 11<br>& Cover |

21